First case for argument this morning is 24-1586, Utech v. United States. Mr. Grayson, whenever you're ready. Thank you, Your Honor. There is a protective order in this case, and I don't know how the court normally deals with that when there's an audience. I mean, the briefs are marked confidential to the extent there's confidential material. Right. I don't know what else. I think that you could try not to state anything that you'd be concerned about being discussed publicly during your argument. Yes, actually, it's the awardee who has the confidential material, Your Honor. But I may need to refer to it during argument. I'll try to let you know if I'm about to do that. Could you just direct us to the page and tell us what to look at without saying it in court? I can try to do that, Your Honor. Thank you. Any comment on the other side about that? Any concerns, special concerns? Because I didn't perceive any in going through the material. Yeah, no objection to that. Thank you. OK. All right, I hope I didn't lose any time there, Your Honor. No. Good morning. May it please the court. Let us contemplate a situation where the government solicits dump trucks and then goes ahead and procures missiles, nuclear missiles, in the same procurement. Dump trucks versus nuclear missiles. Could the maker of nuclear missiles, Northrop Grumman, then file a protest, even though it did not sit on the dump  I assume this has gone to your cardinal change claim. Yes, Your Honor. Is that right? Yes. Can we just assume for the moment that the difference between 24 and 151 is a cardinal change? Let's just assume that for the moment. There are a lot of references in the papers to 24, but almost all of them, maybe all of them, say, quote, 24 annually. And the solicitation is for a contract that could be renewed, I think, for up to five years. How do we read 24 annually? Is that a total of 120 different sites? 24 times 5? Or is it the same 24 sites for each of five years? Under the solicitation, it's the same 24 sites. How can we tell that? Because the 24 sites corresponds exactly to the 24 sites that were legacy sites in this procurement. Can you give us a J.A. page where you're supported with that particular argument you just made? I'm sorry, Your Honor? Can you cite us a J.A. page to support the response that you just made to Judge Stark? I can probably do that during my rebuttal, Your Honor. But there weren't 24 legacy sites. Yes, there were, actually, 24 legacy sites. I'll read to you from. Well, just look at 10, 9, 1, 4. And my count was 27, 18 that had none, and nine that had. So that's 27, that's not 24, right? And three of those 27 sites were awarded to UTEC just before the solicitation was issued, Your Honor. So 27 minus three is 24. So your reading of the solicitation is that unambiguously, it was for 24 sites for one year, or a total of 24 sites for the five-year period? No, 24 sites per year. Most many contracts have a base year and option years. Same thing with this one. For these 24 sites, if they were individually ordered, they had to be individually ordered by the site, then you would have up to 24 sites each year, all of which would be the legacy sites. And by the way, there's another provision in the solicitation that says the same thing. There's another provision in the solicitation that says that the legacy data at these legacy sites has to be transferred using a particular tool, an Olympus tool. OK, but let me, before you get into another point, the first point you made, though, so you read the solicitation, which I'm not sure there's a disagreement. I mean, I think the government's position will find out is it was 24 sites a year. They just said the contract, essentially, the bidding had to come in for five years. And I think that's confirmed with the bids that were submitted. They were for a five-year period. So I don't think they disagree that it was 24 sites annually. So maybe we're saying the same thing, and the only question is whether you construed this as having to submit a bid for five years for 24 sites a year. No, Your Honor, not in the least. We construed this the way it says, which is that this is for the 24 legacy sites only, and the government has already moved well beyond that, well up into the 151 range. So if this was a five-year contract, if somebody was going to submit a bid for five years, would they have the same 24 legacy sites doing over and over again for over a five-year period? Well, yes, when you consider what this is. This is software for a particular internal procedure. So basically, reading x-rays, if you will. That's what this number does. So you're saying that you construed the contract to unambiguously say it's for 24 sites for the first year, and it's the same 24 sites for the second year, the third year, the fourth year, and the fifth year? Up to that, Manny, because those were the only legacy sites. So you're just dealing with the same 24 sites each year. Isn't that contradicted by... I don't want to give stuff up, but if you look at the appendix, whatever title this document is, but it starts at page 10-637. Do you have it in front of you? No, I don't, correct. And it goes on for a bunch of pages. Well, it's a listing per year. And in the first year, they have a provision for, at the very end, it's the annual maintenance support. And the first year, it's nothing. For the second year, it's 24 for the first year, which to me confirms one's understanding of the contract as being different 24 sites every year. That's not what that means, Your Honor. That's simply annual updates that are performed. That's why it's zero the first year. You don't update in the first year. What in the JA can you point us to that supports your reading? I understand you disagree with Judge Prost's reading of the portion she just said to, but is there something that says base year and updates or other language you just used? How can we find something in the record that supports your view? Okay, I don't disagree with what Judge Prost just read to me. I believe that I explained it. Well, let's get this absolutely clear. Judge Prost was asking you, I think, is it 24 different sites for a total of up to 120 over five years? And you, I think, say no. It's the same 24 sites for each of five years. Do we understand your position? It's up to 24 legacy sites, and you can tell that for two reasons. But no more than 24 over the five years. If I looked back after five years, I would only see this contract performed at 24 sites, not 120, correct? Up to that many and only legacy sites. Up to 24. Up to that many and only legacy sites. Up to 24. Right, now, yes. Now, the government is willing to- We're talking about the same 24. We're talking about the same basket. That's what I thought you said to me. The same 24, that's right, the legacy sites. The legacy sites are the 24. So we're not gonna just take your word for it. So where- It would be great, Your Honor. We're not going to just take your word for it. So what I wanna know is where in the appendix, which hopefully you have somewhere, I wanna know where it supports the reading that you just discussed. All right, I'm gonna explain that. No, give me a page. Your Honor, I'll have to do that during my five-minute rebuttal. I cannot give you a page standing here right now. Was the list of 148 facilities included with the solicitation? The list is an attachment to the solicitation. It's 151 total facilities. 151, and that was included with the solicitation. You agree with that? Yes, like many things. I mean, for instance, a building chart could be included with the solicitation. That doesn't mean that it's a requirement for 151 locations. That's not what that means. I mean, you have to read this as a plain meaning. Wait, I get to ask it, then you answer. Yes, Your Honor. Okay, how do you interpret, then, you said there were 151 facilities that were included with the solicitation. You interpreted that as meaning it's only 24? I interpret that as meaning that it's extra information being provided that doesn't contradict the terms of the solicitation and the statement of work. In Section B of the solicitation, it says what you have to do. The list of 151 is not in Section B of the solicitation. Counsel, didn't some bidders ask for clarification? Didn't they ask some questions to try to figure out whether or not it was 24 or some larger number? I don't remember that, Your Honor. I don't remember that happening. And I can understand why, because a plain reading of that solicitation is that it's limited to legacy. Sorry, Your Honor. I'm sorry, you don't remember it happening, or you are agreeing, yes, that happened, questions were asked repeatedly. You have to know this. It's all over the briefing that questions were asked, what is the quantity? The quantity is stated in Section B of the solicitation in the statement of work. Q&A starting at 10.905 of the appendix and going to 10.908, there's three or four questions relating to what is the quantity, and the answer consistently is 24 sites annually. And I think a lot of this case turns on, what does that mean? Yes, and I'm trying to explain what that means in the context of the solicitation. That's right, I agree with you, Your Honor. I agree with you 1,000%. What does that mean, the 24? I will point out that the government has said in its briefs consistently that it has already moved beyond the 24, and that we're no longer being limited to 24. That's the whole point of the government being here today. If we all agreed on that, then there'd be no need for this case. So to me, I think the issue is, it's fair to read this solicitation as ambiguous, because while there are references to 24, 24 annually, there's also, I think you have to acknowledge, plenty of references to this being potentially a VA-wide, a national contract for sites around the country, throughout the United States. Isn't that a glaring facial inconsistency that definitely led others to ask questions at the pages I cited to you, and reasonably should have gotten your client to ask questions, too? Your Honor, no one anticipated this to be uniform throughout the entire country. The 24 sites are located all throughout the entire country. They're national. They're not located in one state or one region. They're all over the country. The legacy sites are all over the country. There's just 24 of them. I'm not sure if that's responsive to my question. There's four pages of questions from somebody asking, hey, we can't figure out what the quantity of this solicitation is, and there's answers. Yes. Shouldn't your client have had to ask, shouldn't this court say your client also should have had to ask questions, and the fact that you didn't means there's a blue and gold waiver? No, there's not a blue and gold waiver for all sorts of other reasons, but to direct it to the point of your question, those questions and answers are in the record. They don't say anything indicating that this is going to be in all 151 locations. They just don't. So the questions and the answers seem to imply, if anything, that everyone agreed that this would be 24 locations, and if you read the solicitation, you'll see it's referring to 24 specific locations, the 24 legacy locations. Counsel, what is your responsive argument to the indefinite quantity language in the solicitation? It's an indefinite quantity. That means that if there are no other terms in the solicitation that limit the quantity, then the government has discretion to change the quantity. In this case, there are. There are several of them. They fall into two categories. The first category is the 24, repeated over and over and over again, at least, I think, 20 times in Schedule B of the solicitation, and secondly, the fact that requirement six, you remember this is a UTEC plus equal, or equal procurement, right? It's a UTEC or equal procurement. It's a brand name or equal procurement. In order to have an equal procurement, you have to have salient characteristics. Salient characteristic number six says that among the things you need to do. Do you have a page cite in the appendix? I'm sorry, Your Honor, I don't have it. I can give it to you. I'll try to give it to you later. They can have that. This is very important, Your Honor. Salient characteristic number six says that the part of the statement of work is to be able to translate existing test results, these existing endoscopy results. Translate existing results from the original format into the new format. That's possible only at the legacy sites. Possible only at the 24 legacy sites. So salient characteristic number six tells you exactly which 24 sites. If we were to agree with you that it's a latent ambiguity here, my understanding is you would ask us, we're just talking about count one, you would ask us to vacate the motion, the dismissal, and remand for further proceedings on the cross motions for judgment on the administrative record. Is that the relief you would seek on count one? Yes. And then what, if anything, could you see or could we foresee happening on those cross motions on count one? Because we would have said your claim is at least plausible that there is a cardinal change here and you didn't waive it because the ambiguity is latent. Is there anything left to be litigated on that claim at that point or have you won? I think we've won. The judge would presumably enter an order based upon her review of the record and based upon no appellate fact finding. Her review of the record should indicate that I'm right and that the procurement's limited to the 24 sites. And then what happens in the real world, because you've already suggested to us, I guess the contract has been awarded for more than 24. No, the government has implemented it for more than 24. That's why it's a cardinal change, Your Honor. Okay, so what would happen in the real world? The lower court would enter, thank you for explaining that. All we're asking for is to be in the courthouse. The lower court, presumably based upon the motions for judgment on the record, on the administrative record, presumably, I would hope, would order that this procurement, this awarded contract, be limited to the 24 legacy sites only during the course of the contract, each option year remaining. There's no injunction in effect. It would only be the remaining parts of this contract. That's all we want. Under your view, and I don't know the answer to this question, is that let's assume that happened and the government said, yikes, that's not what we intended, even if the court said that it unambiguously said something we didn't intend to say. Couldn't the government do something going forward to remedy that? Couldn't they say, whoops, we better cancel this contract and issue a new solicitation with less ambiguity for where we are, so that at the end of the day, I mean, would the law preclude the government for the next three or four years changing the contract to include legacy sites other than the 24 that were included in the list? Absolutely not, Your Honor. The government would be free to do this under the FAR provision that we cited in the briefs. The government, this comes up all the time under FAR 15.204, I think. Okay, all right. So your answer is that they wouldn't be precluded. No, what they ought to do is they ought to reopen the competition. The judge below can decide on that option. I don't want to get into further details of what they do. Yes. I just wanted to know if they were able to do it. Judge Cunningham, did you have something else? All right, you've exhausted your rebuttal time and all of your time, but we'll restore a couple minutes for rebuttal. Very kind of you. Thank you for the consideration, Your Honor. And I didn't speak at all about Blue and Gold, so if Your Honor, if anyone has any questions about that, I'm happy to address that in a couple of minutes. You're graciously giving it to me. You're happy to rest on your briefs as well. Thank you. Thank you, Your Honor. Thank you very much, you all. Mr. Long. Good morning, Your Honor, and may it please the Court. Just a few things, and then I look forward to the Court's questions. Judge Post, you asked whether or not the government agrees that this is limited to 24 sites. We do not agree that it's limited to 24 sites. But what you agree is that, your understanding of the contract is you had to submit a bid for five years, and that each of those five years, it would cover 24 sites annually. No, Your Honor. No. No, our position in the brief is that that 24 is an estimate on a per-year basis. And so when offerors were to submit proposals, and this came up in the Q&A that Judge Stark alluded to, each, the offerors were to assume 24 sites as an estimate for purposes of their proposal, but the awarded contract is not limited to 24 sites per year. Various VA medical centers could order off of this contract, and it could be more than 24, it could be less. Okay, you did say estimates. Okay, moving on to the other kind of questions we explored with your friend. Given 24 as an estimate, so that's your position, 24 annually, his view, as I understand it, is it's the exact same 24 for each of the five years, and that bucket of sites is really limited to the legacy sites. No, Your Honor, and I think it's telling that my friend wasn't able to point to a place in the joint appendix that supports that. I think that the ordering sheets that were referred to during his presentation plainly are broken out by year. There's a base year and four option years, and each year offers an estimate of 24 sites. There's no reason why the same entity or the same VA medical center would have to, could only order a base year, and then that same medical center would be the only one, or those 24, I should say. Are you saying it's 24 unique sites each of those years, such that you would be potentially multiplying 24 by five? Well, keep in mind it's an estimate, Your Honor, but yes, it is each year, and if the government were to pick up option year three, a new VA medical center that had not previously used these services off of this contract could make an order and come into using the services through the awardee probation year. What is your best support in the record pointing us to a JA page that it should not be limited to 24, as opposing counsel argues? So I think it's those ordering sheets, Your Honor, that's at, I apologize. Is that the price cost schedule? Right, so, right, we can see them at 109, 10945, I'm sorry. Okay, I had 10637, is that essentially the same thing? It is, the solicitation was amended, and there are different versions here. They don't differ materially, but the final version of the solicitation, I believe, is at 10945, is the price schedule. One thing I still am not understanding, like how the math is fully working, right? We've been talking about a bunch of different numbers. We've been talking about 148, 151, maybe multiplying 24 by five. Can you kind of explain what's going on with all these different numbers and calculations? Yes, Your Honor, so as I understand the solicitation, the estimate is 24 sites. That came out in Q&A, I think it was. 24 different sites per year, or it could be the same 24 sites every, for five years? 24 sites, that's a good question. I think it's 24 sites per year, but I am not certain of a J-8. Well, his view is it's the same 24 sites, and it's limited to these legacy sites, and I assume your view is that's not true. Hold on one second. If we look at the Q&A 10905. I'm sorry, again, 10905, Your Honor, I apologize. So how many sites, if this is maybe two-thirds of the way down the page, there's a question, and these Q&As are incorporated into the solicitation formally. How many sites is the cost price schedule based off of? 24 annually, the quantities provided are estimates only. VA makes no guarantee regarding actual quantities that may be purchased. Okay, but that doesn't answer my question. His view is that 24 sites annually, but it's the same 24 legacy sites that he points to in this chart. Right, I don't believe there's anything in the solicitation that so limits the approach for the VA. I think that my friend's view of 24 sites is based on his understanding of the facilities list that was included as attachment 13 to the solicitation, and his sort of parsing of which systems, which endoscopy systems are being used by which medical centers at the point of contract award, and sort of developing an understanding of, he comes to 24 that way. I'm not sure the records, I don't believe the solicitation supports that. That's his, I'm sorry, go ahead. What about salient characteristics that's something he argued to us. He argued to us salient characteristics six, and it's statement that data migration is necessary. What is your response to that in particular? So yes, characteristics six I believe refers to an Olympus migration, and some sites in attachment 13 to the solicitation reference that program software. But keep in mind that these VA medical facilities are able to, and I can see that that sounds like you'd only be using it if you were a VA medical center that had that type of system in place at contract inception. But keep in mind that a VA medical center doesn't need to order every item off of the price schedule. It can choose which it needs and how many it needs based on, for example, what system it has in place, or also based, for example, on the number of endoscopic procedures it needs to conduct each year and how many beds and systems are needed. One other question, and I know that Judge Stark has some questions for you as well. What about this Payton versus Layton ambiguity situation? Are you contending that it's at least a Payton ambiguity? No, no, Your Honor. We think the solicitation is clear that there is no requirement that the VA limit itself to only allowing 24 VA medical centers to order on a per year basis or on a base year plus options basis. It's clear that these are estimates, and these estimates do not limit the discretion of the VA as to how it chooses to use this contract. And it doesn't matter whether or not in the back. If we reject that and we think it's ambiguous, you can still prevail if we say that ambiguity is Payton as opposed to Layton, right? Absolutely, yes, Your Honor. Help me on that question. What is it that is obvious and glaring about any inconsistency? I recognize you don't think there's any inconsistency, but if I think there is some, why would I call that inconsistency so obvious and glaring that it's Payton as opposed to something lesser, Layton? So the starting point, I think, is Appendix 10926, which says that this contract is VA-wide. It then defines VA-wide, given shorthand, as national, which I think my friend is focused on the national piece, but it says VA-wide, okay? It also says that the 24 sites are estimates and that actual quantities may differ, and it says that repeatedly in response to Q&As, which, as I said, are a formal part of the solicitation. So at the very least, with respect to the possibility of a Payton ambiguity, again, we don't believe there is one, but if the court disagrees, that is enough to put a prospective offeror on notice that with perhaps UTEC's seemingly internal understanding of what systems are being used where and what's been awarded to whom, that it may be more than just 24. Do we have to think about, if they had asked questions, what kind of useful answers, if any, they would have gotten? Because I have to tell you, when I look at the four pages of Q&A here, what's the quantity, and you quoted some of it 24 annually, that seems ambiguous to me also. So if I think they should have asked questions, but they would have gotten the same ambiguous answers these others got, where does that leave me? So I think to go to one part of your question, Your Honor, and then I'll try to answer the whole thing, keep in mind that we're not talking about what the VA will do. It's what the VA is permitted to do under this contract. And the estimation language gives it the right to order more than 24 sites. And so I understand your concern about the Q&A being ambiguous, but our view is that, okay, maybe it's ambiguous as to what the VA will order, but it is not as ambiguous as to what the VA may order. The problem I have, maybe I'm the only one here who has this issue, but to me, the salient question is, the one you just explored with Judge Stark, but the other question is whether or not there's something in the contract that requires or suggests that it's going to be the same 24 sites for each of the five years. Can you sort of address that? Was the VA, whether they're talking about 24 sites or 100 sites, is there something in the contract that suggests it's the same sites? Because as I read some of the backup material, it appears that there are different sites, or at least allows for different sites in each year. Well, Your Honor, so I'm not able to point you to an appendix page that says this is going to be more than 24 sites, or does not need to be the same 24 sites per year. So concede that point. But first of all, there is an attachment, Attachment 13, that lists some 150 sites. Why would the agency have attached that if it weren't possible that more than the same 24 were going to order off of this contract? And then there's the point that these are estimates. So I think that, again, and this to some extent goes to my response to Judge Stark's question, the point is that there's nothing here that limits what the agency may do with this in terms of going beyond an estimate of 24 sites. And so because of that, there is no such limitation, despite the absence of an explicit statement that we are likely or may or could go beyond this. As part of what's going on here, anyone, any site that does choose to take advantage of what's being offered here, the EIS system in year one, the winner of this contract has to agree to make that available for each of five years to that particular site, assuming the government exercises its right to renew. That is, it's a software system and you all didn't want VA sites who opted in in year one to be cut off in year two. That's part of what the five years means. Is that fair? Yes. So the option is at the government's discretion. And so that would give the government the ability to continue ordering at the prices quoted. But so my understanding of what you're saying the contract meant is, let's say all 24 legacy sites did opt in in year one and they all want to continue for five years and the government exercises its right. Those 24 all get to do it. Probation can't cut them off. Your point though is we, the government, can still have more than those original 24 legacy sites also opt in in year two and year three, even in year one. Is that right? Yes, that's right, Your Honor. And keep in mind that there's a contract administration piece here for the contracting officer and contracting officer's representative at the central level, sort of understanding which sites are using this and what. Can you help me on section 4.3, this legacy data migration services that appears at least at 10, 6, 22, and I think elsewhere. I think what you're telling me is, yes, the winner of this solicitation has to, at minimum, be willing to migrate the 24 legacy sites and there are 24. It's at least alleged that there's 24 legacy sites and since we're on a motion to dismiss, I think I have to take that as true. Would you agree with that? It's a small detail. It's at page 60 where their complaint alleges it's 24. Right. I would think we have to take that as true, but put that aside. Can I just ask you a sub-question of that? Is data migration possible in the 18 sites where there's no provider? I am not sure of the answer to that question based on the records, Your Honor. Well, if the answer is no, that blows up the whole notion that this is part of the 24 that you were talking about, but you don't know the answer to that. Right. I'm sorry, Your Honor. I don't. Thank you. On 4.3, what I understand you to be saying is 4.3 at 10-622 means that probation, since they ended up winning the contract, is agreeing to provide the migration services described at 4.3 to those legacy sites. That is at least part of what they're taking on as their contractual obligation. Is that fair? Yes, with a slight refinement. So all offerors needed to propose a solution that included that, and the government was free to order it as needed, but it didn't need to order every line item off of the contract. And so I think maybe the dispute here, it's becoming slightly clearer to me, is I think the appellant agrees that that's at least part of what the solution provided by probation has to be, but they're saying that's the full total of the contract, and the government can't give more than that because you only solicited for that, for the legacy, for the 24, and that's it, and no more. And you're saying that was part of it, but we can go beyond that, and we reserved our rights to go beyond that. Exactly. There's no cardinal change here because the contract has not been materially altered through amendment of the contract or otherwise because the solicitation always contemplated the possibility of going beyond 24 sites. If you assume the complaint to be correct, the 24 legacy sites, but whatever the case may be, the estimate of 24 could be exceeded. One more? Just one more, sorry. Of course. We have described a latent ambiguity as a hidden or a concealed defect which is not apparent on the face of the document. It took me a lot to understand your position on the contract. Why shouldn't I say if there's ambiguity here that it's latent, that is it's hidden or concealed and not apparent on the face of the solicitation? So in my mind, Your Honor, latent ambiguity is an ambiguity that only becomes clear in the course of contract performance, meaning that you couldn't have known on the day of the solicitation that it was ambiguous because it was so, as you say, concealed that the conflict only became clear later through performance. So our view is that this is not that situation because while my friend says, okay, well, it only became clear later that they were going to go beyond 24, in fact, this is our point about patent ambiguity, if you were to, it would be at most patently ambiguous because as I've recited, there are several places in the solicitation that suggest that the VA is free to go beyond the 24 sites. And so the existence of those explicit statements in the solicitation include the finding of a patent ambiguity because those statements go directly to the problem, alleged problem that UTEC has identified. And I think you would possibly add to that this sheet that lists, confirms that you're talking about potentially national, nationwide. Right, and the VA why, the statement of VA why and the preface of the statement of work as well, Your Honor. Thank you. Why don't we, your friend on your side. Could I please, Your Honor, I just wanted to get to something that Judge Cunningham asked about. I didn't have a chance earlier. You asked about the question of a definite quantity, a definite delivery, a definite quantity contract. I want to clarify something. This is why I'm doing this well beyond my time. So I read this as being what's called a requirements contract. And this is, I read this as being what's called a requirements contract. That's not what the briefs say. That's slightly different from an IDIQ. Generally speaking, I don't think this is going to go to the court's decision, but because you asked about it. An IDIQ identifies minimums that the government must purchase. And beyond that, the government can decide what it wants to order. A requirements contract is a type of contract where the government agrees to get all services identified in the contract from a given offeror. And it is the existence of that requirement that provides the consideration. So because our brief is, shall we say, not clear about this, at least, I just wanted to point that out. Again, I personally have dealt with cases before this court that went into the difference between these two, so I was attuned to it. And I'm happy to answer any questions, but I just wanted to point that out. Let's hear from Neil. Thank you. Good morning. May it please the court, Alex Hantos for probation. In the short time I have available, let me just give the court some sights as to this patent ambiguity issue. Appendix 10610 refers to this IDIQ contract, which task orders will be placed off of. Appendix 10618 refers to a national contract. Appendix 10620 talks about contract ordering process is decentralized and will use ordering officers. And the same site talks about tasks under this contract shall be performed, quote, at VHA facilities throughout the United States and all of its territories. In addition, 10945 reflects cost sheets, which show that expansive ordering would be available under this. And 10905 is the Q&A that has already been discussed. That goes on for several pages. The bottom line is folks asked questions about the quantities that were needed under this contract. And when folks are asking questions, that is great evidence for this court to determine that there was some confusion. Can I ask you about another, all those sites are very helpful, but 12315, it's, I think, confidential. So I won't go into the details unless you say it's okay. But it appears to me to be additional Q&A where the government is reaching out to probation in connection with whether they're gonna award the contract. And it seems to be further sort of confusion between the government and probation, even, as to what the quantity is here. Are you familiar with 12315 and those three questions? And does it have some relevance? If so, even if you speak in generalities, can you help me understand the relevance? I'm happy to address that. Again, goes to the question before the court. Was there a patent ambiguity as to quantities or not? The answer is absolutely, at a minimum, there was a patent ambiguity. Now, the government's position is this is not ambiguous because it's nationwide. But what the protester has to show to avoid the blue and gold fleet rule is that the ambiguity that we've all been talking about for some time is latent, and that cannot be shown. People were asking about the question. There was back and forth with the government. There are multiple places in this solicitation that reflect that there was some confusion. Specifically, because you're out of time, tell me what this adds to that, 12315. I think it shows continued confusion about the quantities available. And again, if we have confusion about that, if there needs to be further dialogue, that's more evidence that this was a patent ambiguity. Looks to me like probation's understanding here was the same as the protester's, that it's only the same 24 sites every year. Am I misreading it? So that goes to the question before the court. Probation's understanding at the time might have been the exact same as the protester's. That does not mean blue and gold fleet saves this protester. I get that it doesn't save them on blue and gold, maybe. But as a factual matter, are you agreeing that probation did have the same understanding as the protester is arguing here? Yeah, I can only agree to what's in the record there. I can agree that that dialogue happened, and that it is what it purports to be. It is consistent with the reading that the protester is reading of the solicitation. Is that what you're acknowledging? I'm acknowledging that dialogue, yes, Your Honor. OK. I still don't think I understand the answer to Judge Start's question. Are you acknowledging that the dialogue occurred, or are you acknowledging that probation had the same interpretation as the interpretation that was described by opposing counsel? So I don't know that I can say yes to the latter bit, because there's a lot more that we disagree with a lot, frankly, that protesters articulated here and in the briefs and in the course of this. So I can agree that the dialogue occurred, and I can agree that someone at probation had that understanding reflected in the record provision that Judge Stark reflected. I think where you go with that is that gets you back to a patent ambiguity at best. And that's where blue and gold fleet applies here. I know I'm way over my time. May I offer one other point? OK. OK. It's the percipient AI en banc decision that this court is well familiar with. I think you should take a look at that decision. And in particular, this is at page 1243, where percipient talks about any issue raised. It says, regardless of the type of challenge brought, one must be an actual or prospective offeror. So when we think about the cardinal change argument, I think percipient may be relevant to your analysis of statutory standing on that. Thank you. All right. We're going to try to keep it even. So we'll rest you over your time, but we'll give you six minutes for rebuttal, which hopefully you will not need. We'll give you six minutes for rebuttal to try to fix that. All right. That's very kind. Thank you. I appreciate that. But since I've been so generous, let me ask the first question, which is, I thought you acknowledged below that no migration was required for these 18 sites where there is no provider. No, Your Honor. I think that actually is a misunderstanding. These 18 sites are sites where the legacy systems were in effect. It's just that there was no current contractor. In other words, if you went in and got an endoscope done on you, it was done according to the legacy procedure. That's what happened. And thank you for asking. I was going to point that out. All right. By the way, I understand that you all are allowed on appeal, based upon the precedence of this court, to make findings regarding patent-related ambiguity on appeal. However, honestly, this seems to be a case that cries out for lower court fact-finding. And Judge Horne is so good at that. So please do get consideration to whether she'll be remanded for that purpose. I've got a lot of cases this week. But didn't she say this was blue and gold applied? She did say that blue and gold applied, yes. That means that she concluded there was a patent ambiguity. If there was an ambiguity, it was patent and not latent, didn't she? That's a fair statement. OK, so she's already, this wonderful judge that you just referred to is already considered that issue. Before this case, she decided five in a row in my favor. Let me give you some citations to the record. By the way, I'm reading to you from pages 5 through 14 of my brief. And I think every question that you asked before is a question I could have answered if I'd had that information at my fingertips. Now I do. On page 9 of the brief, I refer to salient characteristics 6, quote, must include data migration. Now this is very important because this is part of source selection. This is not part of the schedule in section B of the solicitation about what the contractor has to do. This has to do with choosing the contractor. The contractor can be chosen only if the salient characteristics are met, including salient characteristic 6. So on appendix page 10.6.19 and 10.0.0, sorry, 10.0.1.6, and throughout the whole solicitation, and even the plan, the procurement plan, salient characteristics 6 consistently says that, quote, you must include data migration in the performances contract. This is completely clear to anybody who's familiar with this line of work. What, if anything, can you point to? I think that much is agreed, that that has to be part of what the winner performs. But your contention is it's unambiguous that that's the full extent of what's being awarded. What can you point to that helps us see the contract that way? I can point to appendix page 10.0.1.9 and 20, appendix page 10.6.22, appendix page 10.7.98, and appendix page 10.9.30, all of which say that the contractor will migrate four years of prior exams from legacy Olympus EndoWorks systems to the new IAS at each corresponding VAMC in accordance with specific task orders within a six-month period from the start of the clinical usage go-live date. That is the beginning, middle, and end of the argument that it was only a procurement at those 24 legacy sites, because those are the only sites where you could do that. The only sites where you could do that, but there is 130 or so other VA sites that give endoscopy exams and need to organize the results. And what can you point to that says the VA was not soliciting for an EIS system that could potentially be used by all of those sites as well? Well, again, the salient characteristic six says you must be able to do this or you're disqualified. And the fact is, and this is reflected in the record, that at the other sites, the other 57 sites approximately, that EndoSoft, my client, UTech, was performing, that the awardee does not have the ability to migrate that data. They can't. They can't migrate the data. And that's true for the other sites as well. Only the sites where they can migrate the data are their own sites, about 30. And also the sites that were the legacy sites, because there's a special tool that allows people to do that. Are you acknowledging that the contract at least unambiguously was offered to the probation, was available for the probation sites that were probation sites before this all began? No, because the contractor couldn't be selected unless it could do the data migration, quote, from legacy Olympus EndoWorks systems. I guess we're going in circles. If they could do the 24 legacy sites, and they also happen to be probation, and can do the probation 30 sites, this contract was clearly solicited for them to be able to do at least the 24 plus the 30, right? You have to concede that. I don't, because that's not what the solicitation says. In addition to the two-part solicitation that I just quoted, I also refer you to Appendix page 10.027 and eight, page 10.631, page 10.807, and page 10.939. And in all those cases, the performance requirements are include, the performance requirements for each site include number three, legacy data migration services from those same legacy Olympics EndoWorks systems. Legacy means from the Olympus systems. That's what legacy means. In addition to that- I don't understand the argument. I know I'm missing something, but I don't understand if that's a floor, why is that a ceiling? Like they have to at a minimum do this because that's required for some of the sites that are gonna be in the pool. But why does that not allow for the argument the government is making? That's a floor, not a ceiling. No, because this is a performance requirement. It's labeled performance requirement. Performance requirement means it's required for performance. That's what the words are in the, it's part 14 of the statement of work. I'm still not getting the charge post question about why that's not a floor, as opposed to a ceiling. Because we know that some of those sites are gonna be included. So you've got to a minimum be able to do those, but that doesn't preclude other sites. That's not how anybody read this. That's not how anybody involved read this. The reason why my client filed a protest 10 days after learning from an internal government employee that it was spreading beyond the 24 sites is because my client, like the awardee, did not read it that way, Your Honor. Nobody read it that way. That's not what requirement means. That's not what the word requirement means. Council, when people were confused potentially, they actually asked a question, right, to try to get some clarification about what would be covered. I mean, you can go back and forth and back and forth about those questions and answers. I think that Judge Stark got it right. People somehow had some kind of nervousness about this, maybe, I don't know, and they asked amorphous questions and they got very amorphous answers, and that didn't solve the problem. So where does that leave you? The other people did what the government's claiming we should have done, and they didn't get an answer. So where does that leave you? I'd like to also give you a couple more sites on this subject. Okay, let's try to wind it up unless we have questions because we're way over time. Yes, I just want to make sure that I've given the best answer I can to Judge Cunningham's question, which is why is this not merely a floor? That was Judge Prost's question, but I have the same question as well, so I want to know the answer. Thank you. So continuing, on page 1072, page 10699, page 10875, and page 11006, it says, technical proposal, minimum technical requirement must include data migration. The following errors must be addressed in your proposal, legacy data migration. Then it goes on to say, under the heading, attachment D, minimum technical requirements, MTRs, appendix 10, six, one, appendix 10, six, nine. Counsel, let me just ask you one final question that I think you can. Well, you can give us the pages of your brief and then we can look at them. Yes. Do you have any page that you can cite to us where it says it's a maximum of 24? You got anything in the record you can cite as you stand here where it says it's a maximum of 24? What I, as answering that as best I can, Your Honor, if you, let me, give me a moment and I'll give you that information. No, I mean, that's a yes or no. Do you know anywhere in the record where it says it's a maximum of 24? That's all I wanted the answer. Yes. If you go through the facilities list, that's where you find that there are 24 that are area, 24 legacy Olympus Endowork Systems sites. That's on attachment 13. That's the answer to your question, Your Honor. Okay, I think we're all set. All right, can I just give you a couple more sites to the record?  Okay, thank you. I appreciate it. Minimum technical requirements, salient characteristics six, must include data migration. We've already been through that one. That's a different one, but okay. Are you reading from your brief at a certain page? Yes, I'm reading from the brief at pages nine and 10. Okay, well, we've already read that, but we will make sure to take a close look at those. Thank you. Okay. Other points? Thank you. We thank both sides. The case is submitted. I appreciate the extra time so much, Your Honor. Thank you all.